UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
10 NOV 29 PM 4: 20
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| STEVEN ROBERT KOZLOWSKI, <br><br> PLAINTIFF, <br><br> V. <br><br> SUSAN M. KOZLOWSKI, <br><br> DEFENDANT. | 1:10-cv-1538 RLY-TAB <br> CASE NO. <br><br> JURY TRIAL REQUESTED |

## COMPLAINT

COMES NOW Plaintiff, Steven Robert Kozlowski ("Steven"), by counsel, for his Complaint against Defendant, Susan M. Kozlowski ("Susan"), states as follows:

### Introduction

1. This matter involves an action by Plaintiff, the only son of the Decedent Robert Kozlowski against Susan, the decedent's second wife of five years. Plaintiff brings this action against Susan, who after Robert was diagnosed with a terminal illness in 2005, began a deliberate effort to circumvent her prenuptial agreement with Robert and tortiously interfere with Plaintiff's inheritance. At the time of Robert's diagnosis, Susan was bound by a prenuptial agreement and was also aware that Robert's $11,000,000 estate was intended for Plaintiff. Susan abused her position of confidence with Robert while he was in a diminished state of mental capacity through his illness, treatment and medication and intentionally interfered with Robert's lifelong plan to bequest his $11,000,000 estate to his only son, Steven.

1

## Jurisdiction and Venue

2. This Court has jurisdiction over this cause of action because diversity of citizenship of the parties exists pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of fees and costs, exceeds the jurisdictional amount of $75,000.00.

3. The Defendant resides in the Southern District of Indiana. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1).

## Parties

4. Plaintiff Steven is the natural son of Robert and is domiciled in Miami-Dade County, Florida. Plaintiff is the only child of Robert.

5. Susan is the second wife of Robert and is currently the personal representative of Robert's estate. Susan is domiciled in Boone County, Indiana.

## Factual Background

6. Plaintiff Steven brings this action against Defendant Susan, the second wife of his late father, Robert C. Kozlowski (hereinafter "Robert") because Susan tortiously interfered with Steven's inheritance from his father.

7. Robert was born on October 11, 1947 in Norwich, Connecticut to Chester Kozlowski and Theresa Kozlowski. Robert had a sister Jean Kozlowski-Desrosiers that is 10 years younger than him.

8. In 1968, Robert married Carolle Denis, and Steven is the only child of that marriage. Steven was born in 1969 and is the only child of Robert.

9. Steven enjoyed a close relationship with his father and had, throughout his life, been the natural object of his affection and benevolence.

10. Throughout his young life, Robert asked plaintiff to make sacrifices for the benefit of Robert's career, including moving from Connecticut to upstate NY at age 10 and start over again at age 14 moving from NY to Indiana.

11. In 1993, Robert and Carolle divorced after being married for 23 years. Steven maintained a close relationship with his father through his parents' separation and divorce. Steven became closer with Robert after the divorce despite the challenges of being an only child of divorced parents.

12. Between 1992 and 2000, Robert lived with Lynn Slone in Kendallville, Indiana. Robert and Lynn were in a loving and caring long term relationship. Robert and Lynn were never married as Robert believed in keeping their assets separate.

13. Robert believed in keeping their assets separate because he felt that his success was built upon the sacrifices he and his family had made.

14. Over the years Steven became close with Lynn and her daughter Jenny Slone ("Jenny"). Jenny lived with Robert and Lynn during the entirety of Robert and Lynn's relationship. Jenny was a minor throughout that time.

15. In 1993, Plaintiff moved to Miami, Florida to attend law school. Plaintiff has resided in Florida ever since and is a practicing business transactions attorney.

16. Robert would regularly visit his son Steven in Florida. Sometimes Robert would visit alone sometimes with Lynn.

17. Since moving to Florida, Steven would regularly visit his father in Indiana and Michigan where his father had a summer home.

18. In May of 2000, Lynn was diagnosed with liver cancer and Robert became her caregiver. The diagnosis was sudden and unexpected.

19. Lynn passed away in August of 2000 while at hospice with Robert in their home at Kendallville, IN.

20. Robert told Steven that Lynn's death had a profound impact on him as he watched her pass away.

21. Despite being in a long-term loving relationship with Lynn as well as being her caregiver, Lynn's estate went to her only daughter, Jenny. This was told to Steven by Robert illustrating that the same would be true of him. Robert specifically told Steven on more than one occasion that he was Robert's sole heir and personal representative.

22. In November of 2000, Robert was in Connecticut visiting his mother and sister for the Thanksgiving holiday.

23. Robert, his sister Jean and her husband, Eddy Desrosiers, were all at a lounge at the Foxwoods Resort and Casino in Mashantucket, Connecticut. Robert's sister Jean struck up a conversation in the ladies room with a woman who was complaining about her internet date. Jean jokingly stated "you should meet my brother, he's good looking and he's loaded." The woman Jean was speaking to was Defendant Susan.

24. Defendant Susan and her "internet date" joined Robert, Jean and Eddy upon Eddy and Jean's invitation. Susan positioned herself in order to introduce herself to Robert.

25. Prior to meeting Susan in 2000, Robert had already amassed substantially all of his probate and non-probate assets.

26. Susan and Robert began communicating by email and in 2001 began a casual long distance relationship.

27. In the summer of 2002, Susan relocated to Fort Wayne, Indiana where Robert had moved after Lynn's passing.

28. At that time, Susan was still involved in legal proceedings with her ex-husband over financial issues. Susan's battles with her ex-husband over money lasted from 1998-2004.

29. Prior to marrying Susan, Robert had a last will and testament that devised and bequeathed substantially all of the probate assets to his only child, Steven (the "Valid Will"). A copy of the Valid Will is attached hereto as Exhibit "A".

30. Plaintiff is also aware of a Will executed subsequent to the Will in Exhibit A, which also appointed Plaintiff as personal representative and sole heir. Robert specifically discussed this subsequent Will several times with Plaintiff between 2000 and 2006. Plaintiff understood that a copy of the Will was in Robert's records.

31. The Valid Will in Exhibit "A" also appointed Steven as personal representative of his father's probate estate.

32. Robert and Susan married on June 17, 2004 at a private ceremony in Arizona. Steven was present at the wedding.

33. To preserve Robert's testamentary intent that Steven—and not Susan—receives substantially all of Robert's assets upon his death, Robert and Defendant Susan jointly drafted and executed a valid, enforceable Prenuptial agreement (the "Prenuptial Agreement") prior to their marriage. A copy of the Prenuptial Agreement is attached hereto as Exhibit "B".

34. The Prenuptial Agreement transferred substantially all of Robert's non-probate assets to Steven upon Robert's death. *See* Ex. "B".[1]

35. When Robert Kozlowski married Susan in 2004, his net worth was $11,619,412.00 as listed in his Prenuptial Agreement.

---

[1] Under the prenuptial agreement, upon Robert's death, Susan was to receive $50,000.00 per year for the rest of her life.

36. Susan's assets were so minimal that a schedule of same was not created for the Prenuptial Agreement.

37. The content of the Prenuptial Agreement in *Exhibit B* is consistent with Robert's lifelong position on his assets going to his son.

### Robert's Illnesses

38. In January of 2005, Robert was diagnosed with a rare form of Non-Hodgkin's Lymphoma. Prior to this diagnosis, Robert had never been diagnosed with a serious and potentially terminal illness and appeared to be in good health.

39. Subsequent to diagnosis, Robert consulted with and sought opinions from various medical facilities, including the Mayo Clinic in Minnesota.

40. Robert remained generally asymptomatic through 2005 and the general medical advice was to delay chemotherapy or radiation treatment until absolutely necessary.

41. In 2006, Robert began experiencing symptoms from the Lymphoma including Lymphedema, which is the localized collection of lymphatic fluid due to blockage. Robert began experiencing Lymphedema in his legs as well as swelling in the groin area.

42. In 2006, Robert also began having bouts with Cellulitis, a bacterial infection related to Lymphedema. Robert was hospitalized on more than one occasion for this infection. Cellulitis, if untreated is life threatening for patients with Lymphoma.

43. In order to treat the now symptomatic lymphoma and resulting lymphadema, Robert began radiation treatments at the Indiana University Cancer Center in Indianapolis, Indiana. Among other treatments, Robert began receiving Rituxan treatments.

44. In April of 2007, Robert began feeling seriously ill after receiving radiation therapy.

45. In particular, Robert began having trouble breathing. His condition worsened by the end of April 2007. Robert was concerned that he would have to be hospitalized.

46. Robert's condition continued to worsen and his state-of-mind was compromised. Shortly thereafter, Robert was hospitalized with severe pulmonary distress. At that time, Robert was diagnosed with PCP Pneumonia, which is a life-threatening condition for individuals such as Robert who suffered from a compromised immune system. Robert had been suffering from PCP Pneumonia as early April 2007.

47. Further, Robert was also diagnosed with Pulmonary Fibrosis, which was caused by a reaction to his prior Rituxan treatments prior to April 2007. The damage caused by the fibrosis made Robert susceptible to PCP Pneumonia of which he became symptomatic starting in April 2007.

48. As a result of his pulmonary distress and the undiagnosed illness in April 2007, Robert could not act independently and relied on Susan.

49. Susan was aware of and had knowledge of Robert's weakened and susceptible state of mind.

50. During this period of Robert's declining health in late 2006 and early 2007, Susan took control of Robert's healthcare management and influenced other aspects of his life.

51. Robert became dependent on Susan for all facets of his medical care and wellbeing. Susan was responsible for informing Steven of Robert's medical condition of which she deliberately minimized, including but not limited to informing Steven of the May 2007 emergency hospitalization. Susan also informed Steven that it was not necessary to visit during the hospitalization and did not fully disclose to him of the serious stage of the Pneumonia.

52.     Subsequent from his release from his first major hospitalization Robert was put on an increased routine of daily medications. Even prior to this hospitalization, Robert was on daily medications that affected his mental state, capacity and overall personality, including but not limited to Predisone.

53.     Robert's illness continued to progress and his condition continued to deteriorate. Between September and November 2008, Robert began a series of in-patient chemotherapy treatments to prepare him for a stem-cell transplant.

54.     In November 2008, Robert received a stem-cell transplant at the Indiana University Cancer Center. The effect of the transplant was determined to be unsuccessful. This caused Robert an increased amount of distress. Robert continued to suffer from the deteriorating effects of the Lymphoma, Lymphedema and his other accumulating illnesses subsequent to the stem-cell transplant.

55.     In the summer of 2009, Robert's condition began to cause pain and he began pain management care with an oncology pain management specialist. The significant amounts of medication given to Robert on a daily basis were then increased.

56.     In August 2009, Robert entered into home hospice care at his home in Zionsville, Indiana. Robert was heavily medicated and unable to care for himself. Robert's mental and physical condition continued to deteriorate. On October 15, 2009, Robert passed away days after his 62nd birthday.

### *Genesis of the 2007 Will*

57. After his death, Robert's purported last will and testament dated April 30, 2007 was probated in Boone Superior Court 1, Estate Docket: 06D01-0911-EU-131 (the "2007 Will"). A copy of the 2007 Will is attached hereto as Exhibit "C".

58. Upon information and belief, while Robert was seriously ill with Pulmonary Fibrosis and PCP pneumonia, Susan attempted to circumvent the provisions of the Valid Will and Prenuptial Agreement by directing the drafting of the 2007 Will. The existence of this 2007 Will was kept from Steven.

59. On April 30, 2007, while seriously ill with Pulmonary Fibrosis and PCP pneumonia in Indianapolis, Indiana, Robert purportedly signed[2] the 2007 Will in a heavily medicated state. No videotape or audio recording was made of Robert's purported execution of the 2007 Will.

60. At all times relevant herein, the witnesses listed in 2007 Will were in Kendallville, Indiana while Robert was in Indianapolis, Indiana purportedly signing the 2007 Will as Robert was too ill to travel 3 ½ hours one way to Kendallville. The signature on the 2007 Will was verified by telephone.

61. The witnesses listed in the 2007 Will did not witness: (i) Robert sign the 2007 Will; (ii) acknowledge his signature in the 2007 Will; or (iii) someone else sign the 2007 Will in Robert's name at Robert's direction and in Robert's presence.

---

[2] Steven does not admit to the authenticity of the Robert's signature on the 2007 Will and reserves the right to present expert testimony as to the potential forgery of same.

### *2007 Will Circumvented Robert's Estate Plan by Diverting Control and Probate Assets to Susan*

62. The 2007 Will made material changes to Robert's lifelong estate plan.

63. The 2007 Will disinherited Steven and bequeathed all personalty and devised all realty to Susan. This action was completely contrary to prior statements made to Plaintiff by Robert.

64. The 2007 Will removed Steven as personal representative of Robert's estate and appointed Susan as the personal representative. This action was completely contrary to prior statements made to Plaintiff by Robert.

65. If Susan could not serve as personal representative of Robert's estate, the 2007 Will appointed Jessica Horwitz, Susan's daughter who is unrelated to Robert, to serve as personal representative.

66. In no event was Plaintiff Steven to serve as personal representative under the 2007 Will again, contrary to discussions Steven had with his father who appreciated his position as an attorney.

### *Susan Wrongfully Converted Robert's Probate Assets into Co-Tenancy Property in an Attempt to Avoid Probate and any Potential Will Contest by Steven*

67. Prior to Robert being diagnosed with his terminal illness, Robert held all his assets solely in his name. *None* of Robert's assets were held with Susan as joint tenants with rights of survivorship, tenants by the entireties, or in any other type of co-tenancy relationship.

68. After Robert was diagnosed with his illness, Robert was in a weakened and compromised state of mind due to his disease, daily regime of consuming heavy medications, and his realization of impending death.

69. Susan, relying on Robert's weakened and susceptible state of mind, concocted her artifice to deprive Steven of his inheritance and prevent a potentially successful will contest from depriving her of Robert's assets.

70. Susan began adding her name as joint owner on Robert's financial accounts.

71. Susan also attempted to convert Robert's solely-owned assets into joint tenancy with rights of survivorship property.

72. Susan also attempted to convert Robert's solely-owned assets into tenancy by the entirety property.

73. Susan transferred some of Robert's assets to her children Jessica Horwitz and Zachary Horwitz.

74. Susan may have transferred Robert's assets into her own name or her own accounts.

75. As part of her intentional manipulation of Robert's weakened state of mind and interference with Robert's original testamentary wishes, Defendant Susan manipulated medical information given to Steven and Robert's relatives to minimize the progression of Robert's illness. Susan would then portray to Robert that his relatives were uncaring about his condition.

76. As part of her intentional manipulation of Robert's weakened state of mind and interference with Robert's original testamentary wishes, Defendant Susan worked to isolate Robert from his blood relatives. Susan even went so far as to convince Robert in his confused state of mind that his sister Jean was drugging his mother, Theresa. Susan created and manipulated hostility by Robert toward his relatives. Susan expressed this to Robert even though Susan was aware that Robert's mother suffered from dementia and Jean was her caregiver. Susan convinced Robert in his lonely and frightened state of mind that his own mother didn't

care about him. The purpose of these actions was to interject herself into Robert's life as the sole caring person.

77. As a further example of Susan's manipulation of her isolation of Robert from his relatives, Susan would answer the phone and hang up on Robert's sister Jean when she called. Susan would then express to Robert how little Jean cared because she wasn't calling.

78. Prior to Robert's first serious effect of the lymphoma in 2007, Robert enjoyed a close and loving relationship with all of his blood relatives, including his sister Jean and mother Theresa.

79. As part of her intentional manipulation of Robert's weakened state of mind and interference with Robert's original testamentary wishes, Defendant Susan attempted to isolate Robert from Plaintiff Steven by manipulating information between Robert and Steven. After Robert was diagnosed and became ill, Susan remained present for every conversation between Steven and his father, whether by phone or in person.

80. As part of her intentional manipulation of Robert's weakened state of mind and interference with Robert's original testamentary wishes, Defendant Susan forged Robert's signature on documents and drafted letters and other correspondence in his name, including but not limited to emails.

81. As part of her intentional manipulation of Robert's weakened state of mind and interference with Robert's original testamentary wishes, Defendant Susan directed the inter-vivos transfers of Robert's property to her name.

82. Prior to Plaintiff's forced opening of his father's probate estate, Susan kept all estate documents from Steven.

## *Will Contest*

83. After Robert's death, his estate was opened in the Boone County Superior Court, Estate Docket 06D01-0911-EU-131, and the 2007 Will was probated. Pursuant to the terms of the 2007 Will, Susan was appointed as personal representative.

84. Because Steven was entitled to the vast majority of Robert's probate and non-probate estate under the Valid Will and the Prenuptial Agreement, Steven filed a will contest in the Boone County Superior Court, Estate Docket 06D01-0911-EU-131 in February 2010 challenging the 2007 Will.

85. In the Amended Personal Representative's Inventory, Susan claims that the value of Robert's estate is only $470,135.47. A copy of the Amended Personal Representative's Inventory is attached hereto as Exhibit "D".

86. Susan claims that the remaining $11 million of Robert's assets were held in co-tenancy (joint tenancy with rights of survivorship, tenancy by the entireties, etc.); therefore, passed directly to her outside of probate because they are non-probate assets.

## **COUNT I – TORTIOUS INTERFERENCE WITH AN INHERITANCE**

87. Plaintiff hereby incorporates by reference paragraphs 1-86 as if fully set forth herein.

88. Plaintiff Steven had an expectation to be the beneficiary of his father's estate. This expectation was given to him from his father's own statements and actions.

89. As previously described, Susan intentionally interfered with Plaintiff's approximately $11 million inheritance from his father, Robert through her acts of fraud, undue influence, manipulation and other intentional conduct.

13

90. As a direct and proximate result of Susan's intentional interference with Plaintiff Steven's inheritance, Robert's estate plan was altered and Susan became the personal representative under the 2007 Will as well as the illegitimate beneficiary of inter-vivos transfers of Robert's assets.

91. The will contest filed by Steven in Boone County Superior Court, Estate Docket 06D01-0911-EU-131 does not provide an adequate remedy for Steven because the probate court may not have authority over Robert's wrongfully converted co-tenancy assets.

92. Under Indiana law, a separate action for tortious interference with an inheritance is proper if the victim's will contest remedies are inadequate.

93. Because the disputed property is allegedly held as non-probate assets, a will contest seeking the redistribution of probate assets fails to adequately compensate Steven.

94. Thus, Steven's action for tortious interference with an inheritance is properly before this Court.

## COUNT II – TORTIOUS INTERFERENCE WITH A CONTRACT

95. Plaintiff hereby incorporates by reference paragraphs 1-86 as if fully set forth herein.

96. The Prenuptial Agreement constitutes a valid and binding contract by and between Robert and Defendant Susan.

97. Plaintiff Steven is a third party beneficiary under the Prenuptial Agreement and is entitled to receive the benefits and remedies set forth therein.

98. Susan tortiously interfered with the Prenuptial Agreement to her benefit and to the detriment of the Steven, the Prenuptial Agreement's beneficiary.

## COUNT III – PUNITIVE DAMAGES

99. Plaintiff hereby incorporates by reference paragraphs 1-98 as if fully set forth herein.

100. Susan's willful and wanton actions demonstrate malice, aggravated or egregious fraud and oppression, with a conscious disregard for the rights of other persons including Plaintiff that has caused substantial harm, entitling Plaintiff to recover punitive damages from Susan.

101. Punitive damages should be awarded in an amount to punish Susan and deter her from committing similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Steven Robert Kozlowski, prays that the Court find in his favor on all counts and order the following relief:

a. Order the Defendant to pay Plaintiff compensatory damages;

b. Order the Defendant to pay Plaintiff punitive damages;

c. Order the Defendant to pay Plaintiff pre- and post-judgment interest; and

d. Order all other monetary and/or equitable relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Steven Robert Kozlowski, by counsel, respectfully requests a jury trial for all issues deemed so triable.

Respectfully Submitted,

*[signature]*

Richard D. Hailey, Attorney No. 7875-49
**RAMEY & HAILEY**
9333 N. Meridian Street, Suite 105
Indianapolis, Indiana 46260
Telephone: (317) 582-0000
Facsimile: (317) 582-0080
Rich@RameyandHaileyLaw.com

*[signature]*

Justin W. Leverton, Attorney No. 25678-49
**RAMEY & HAILEY**
9333 N. Meridian Street, Suite 105
Indianapolis, Indiana 46260
Telephone: (317) 582-0000
Facsimile: (317) 582-0080
Justin@RameyandHaileyLaw.com

*Counsel for Steven Robert Kozlowski*